UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:09-CV-00511-ACC-DAB
Chief Judge Anne C. Conway
Magistrate Judge David A. Baker

AZIZALLY S. VIRANI, and
ALINA A. VIRANI,

      Plaintiffs,

v.

HOMEFIELD FINANCIAL, INC.;
SELECT PORTFOLIO SERVICING,
INC.; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., as
nominee of Homefield Financial, Inc.; and
U.S. BANK NATIONAL ASSOCIATION,
as trustee, on behalf of the holders of the
Home Equity Trust 2005-6 Home Equity
Pass-Through Certificates, Series 2005-6,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS FILED BY
MORTGAGE ELECTRONIC REGISTRATION SYSTEM'S,
SELECT PORTFOLIO SERVICING, INC.,
AND U.S. BANK, NATIONAL ASSOCIATION**

**INTRODUCTION**

Defendants' Motion to Dismiss Plaintiff's Complaint advances numerous arguments, none of which meets the legal standard required to succeed on a motion to dismiss. In addition, Plaintiffs' Complaint meets the requirements of Rule 8, Fed.R.Civ.P., and there is no basis for requiring a more definite statement. For the following reasons the Defendants' Motion to Dismiss should be denied.

## I.   THE MOTION TO DISMISS SHOULD BE DENIED

### A.   The Legal Standard for a Motion to Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond doubt

that the plaintiff could prove no set of facts in support of his claim which would entitled him to

the plaintiff could prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L.Ed. 2d 80 (1957). The allegations of the claim

must be taken as true and must be read to include any theory on which the plaintiff may recover.

*See Linder v. Portocarrero*, 963 F.2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*,

376 F.2d 43 (5th Cir. 1967)).

Recently, Judge Corrigan, in the Middle District of Florida, wrote:

> Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and
> plain statement of the claim showing that the pleader is entitled to
> relief. *Erickson v. Pardus*, ___ U.S. ___, ___, 127 S.Ct. 2197,
> 2200, 167 L.Ed.2d 1081 (2007). Specific facts are not necessary;
> the statement need only give the defendant fair notice of what the .
> ... claim is and the grounds upon which it rests. *Id.* (quoting *Bell
> Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167
> L.Ed.2d 929 (2007)). While a complaint attacked by a Rule
> 12(b)(6) motion to dismiss does not need detailed factual
> allegations, . . . we do not require heightened fact pleading of
> specifics, but only enough facts to state a claim to relief that is
> plausible on its face. *Id.* at 1964, 1974.

*Bassler v. George Weston Bakeries Distribution, Inc.*, 2008 WL 4724434 *1 (M.D. Fla. October

24, 2008).

In *Alphamed Pharmaceuticals Corp., v. Arriva Pharmaceuticals, Inc.*, 391 F.Supp. 2d

1148 (S.D. Fla. 2005), Judge Altonaga set forth the standard that must be applied to succeed on a

motion to dismiss:

> For purposes of a motion to dismiss, the court must accept the
> allegations of the complaint as true. *United States v. Pemco
> Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999) (en banc).

Moreover, the complaint must be viewed in the light most favorable to the plaintiff. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F. 2d 948, 953 (11th Cir. 1986). To warrant a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackstone v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

\* \* \*

In deciding a motion to dismiss, a court may only examine the "four corners of the complaint and any matters incorporated therein, and not matters outside the complaint, without converting the motion to dismiss into a motion for summary judgment." *Id.* At \*4. *See Cromwell v. Morgan Stanley Dean Witter Servs., Co., Inc.*, 87 F.Supp.2d 1287, 1290 (S.D. Fla. 2000); *Blount v. Sterling Healthcare Group, Inc.*, 934 F. Supp. 1365, 1368 (S.D. Fla. 1996) (footnote omitted).

Applying that standard, the Defendants' Motion to Dismiss should be denied.

## B.   Court Filings of Pro Se Litigants Should be Construed Liberally

We construe pro se filings liberally, and hold them "to less stringent standards than formal pleadings drafted by lawyers," *Bivings v. Wakefield*, 316 Fed. Appx. 177 (3rd Cir. 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). See also *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) (discussing the "time-honored practice of construing pro se plaintiffs' pleadings liberally.")

When, as in this case, the plaintiff is a pro se litigant, we have a special obligation to construe his complaint liberally. *Zilich v. Lucht*, 981 F.2d 694 (3d Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972).

**C.**    **Plaintiff's Complaint States a Cause of Action Against the Defendants Select Portfolio Servicing, Inc. and U.S. Bank**

**1.    TILA Rescission**

Defendants SPS and U.S. Bank make two main assertions as grounds for dismissal in their Motion to Dismiss.  First, SPS and U.S. Bank state that Plaintiffs were provided all the material disclosures because the material disclosures were attached as exhibits to Plaintiffs' complaint.  SPS and U.S. Bank misunderstand the meaning of material disclosures" under TILA. The term "Material Disclosures" under TILA not only refers to the documents that must be provided but also, and most importantly, refers to the information provided on those documents including, but not limited to, an accurate APR, accurate finance charge, accurate payment schedule, etc..  When it comes to TILA, "hypertechnicality reigns." *Handy v. Anchor Mortgage Corp.*, 464 F.3d 760, 764 (7th Cir. 2006).  TILA imposes an explicit requirement that a lender include "[t]he number, amount, and *due dates or period of payments scheduled to repay the total of payments*," in its Disclosure Statement to the borrower. 15 U.S.C. § 1638(a)(6) (emphasis added); see also 12 C.F.R. § 226.18(g)(1). The relevant section of the FRB commentary states that:

> To meet this requirement creditors may list all of the payment due dates. They also have the option of specifying the "period of payments" scheduled to repay the obligation. As a general rule, creditors that choose this option must disclose the payment intervals or frequency, such as "monthly" or "bi-weekly," and the calendar date the beginning payment is due. For example, a creditor may disclose that payments are due "monthly beginning on July 1, 1988." This information, when combined with the number of payments, is necessary to define the repayment period and enable a consumer to determine all of the payment due dates. Supp. I, para. 18(g)(4)(I); 63 Fed. Reg. 16673.

In the instant case, the Truth in Lending Disclosure failed to list the "due dates or period of payments scheduled to repay the total of payments" in violation of §1638(a)(6).  The final TIL showed 24 payments beginning July 1, 2005 at $1,197.54, 335 payments at $1,438.41 beginning July 1, 2007, and the last payment of $1,438.26.  However, pursuant to the Note, the date of the

first change rate will be June 1, 2005 and interest rate at the first rate change is 10%, which would be calculated to be $1,564.68. The difference between the amount on the TIL at the first rate change and the correct calculated amount is $126.27. The annual percentage rate (APR) and the finance charge were calculated using the $1,438.41, thereby understating both the APR and the finance charge. Pursuant to TILA, the allowable variance in the finance charge is not more than $100.00. Additionally, the APR must be within 1/8 of 1 percentage point of the actual APR. 12 C.F.R. § 226.22(a)(2).

The Note provides for a rate change every six months of not more than nor less than 1% with each rate change, which is not reflected on the final TIL. Pursuant to the Note, the payment schedule on the final TIL should have been 23 months beginning July 1, 2005 at 7% for a payment of $1,197.54, 6 months beginning June 1, 2007 at 10% for a payment is $1,564.68, 6 months beginning December 1, 2007 at 11% for a payment is $1,693.22, 6 months June 1, 2008 at 12% for a payment is $1,823.68, 318 months beginning December 1, 2008 at 13% for a payment is $1,955,75 then one final payment of $1,948.21.

Calculating the difference, using ARPWIN 6.2.0 found on the website of the Office of the Controller of Currency, the APR is understated by 2.8142% and the finance charge is understated by $169,863.04. A copy of the calculation is attached as Exhibit A.

It has been well established that the purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). The Act requires creditors to make "clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen*

*Fed. Bank*, 523 U.S. 410, 412 (1998).  If the creditor fails to do so, it can be held liable for criminal penalties, see 15 U.S.C. § 1611, and a debtor can sue for damages (including a statutory penalty of twice the finance charge), see 15 U.S.C. § 1640(a). *Beach*, 523 U.S. at 412.

TILA also requires the disclosure of items such as the Yield Spread Premium, Private Mortgage Insurance, and a mortgage broker fee to be disclosed as these items are used in the calculation of the finance charge and annual percentage rate (APR).  Failure to disclose these items results the miscalculation and an understatement of both the finance charge and the APR. None of these items were disclosed in either the HUD-1 or the TIL.

Finally, the Notice of Right to Cancel was deficient as it failed to set forth the date the rescission period expires.  The law is very clear on what is required when it comes to the notice of right to cancel. Each borrower, must receive two notices of right to cancel which clearly and conspicuously disclose: (1) the retention or acquisition of a security interest in the consumer's principal dwelling; (2) the consumer's right to rescind the transaction; (3) how to exercise the right to rescind with a form for that purpose, designating the address of the creditor's place of business; (4) the effects of rescission; and (5) *the date the rescission period expires* (Regulation Z § 226.23(b)(1)(i-v)).

Because the Notice of Right to Cancel was defective and the required material disclosures were not provided, Plaintiffs had a continuing right of rescission for three years or until May 17, 2008.

For loan transactions involving security interests in a debtor's primary residence -- the debtor can demand that the creditor rescind the mortgage if certain material disclosures are not made. See 15 U.S.C. § 1635(a).  United States Code section 1635(a) and (f) provides that in any consumer credit transaction

in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the [debtor] shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required by this subchapter, whichever is later . . . .

\* \* \*

An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the *information* and forms required under this section *or any other disclosures required under this part have not been delivered to the obligor*....[emphasis added]

Plaintiffs exercised their right of rescission within the three year statute of limitations imposed by section 1635 by mailing their rescission letters on March 24, 2008 to SPS, Homefield, and U.S. Bank. If the creditor does not take steps to do so within twenty days, the debtor can bring suit in federal court to enforce their right of rescission. Id. § 1635(b). Additionally, U.S.C. §1641(c) entitles Plaintiffs to rescind their mortgage transaction against the assignee.

U..S.C. §1635(g) provides that a court may award damages under section 1640 in addition to rescission for a separate violation under the Act. The failure of Homefield, SPS, and U.S. Bank to take the required steps under Section 1635 to the notice of rescission constitutes a separate violation. Section 1640 provides:

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
(1) any actual damage sustained by such person as a result of the failure;
(2)
(A)

(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction....

The statute of limitations for bringing an action under section 1640 is "one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). In this case, the "date of the occurrence of the violation" is twenty days after SPS, U.S. Bank, and Homefield received Plaintiffs' notice of rescission. Plaintiffs' notice of rescission was mailed March 24, 2008, therefore the "date of the occurrence of the violation" would be on or around April 13, 2008. Plaintiffs' filed the instant action on March 23, 2009, within one year of the "date of occurrence of the violation."

### 2.    RESPA Claims against Homefield

Upon information and belief, Plaintiffs were charged a Yield Spread Premium ("YSP", which is required to be disclosed by the Truth-In-Lending Act). However, the YSP was not disclosed on the HUD-1 Settlement Statement and thus there was no disclosure of the true cost of the loan. As a direct and proximate result of these failures to disclose as required by TILA, Homefield received a YSP in a substantial amount without preliminary disclosure, which is a per se violation of 12 CFR § 226.4(a), 226.17 and 18(d) and (c)(1)(iii). The YSP raised the interest rate which was completely unknown to or approved by the Plaintiffs, as they did not received the required GFE or IOAF.

Additionally, the YSP was not disclosed in Homefield's broker contract (which was first presented to the Plaintiffs at the closing table), which contract states only that the compensation received will be between $0 and $7,200. The contract further states that if a range is disclosed, the exact amount will be disclosed at closing. The exact amount was never disclosed at the

closing. This is an illegal kickback in violation of 12 USC § 2607 as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

### 3.   RESPA claims against SPS

On January 28, 2009, Plaintiffs faxed and mailed a Qualified Written Request ("QWR") to SPS requesting information including but not limited to the fees charges, costs charged, escrow accounting, assignment(s) of the security instrument, etc. in order to validate the alleged debt. When SPS failed to respond to the QWR, Plaintiffs mailed a second QWR on February 20, 2009. Plaintiffs mailed a third QWR on June 29, 2009. A copy is attached as Exhibit B. To date, SPS has failed to acknowledge receipt of any of the QWRs nor has SPS responded.

Section 2605(e)(1)(B) defines a QWR as

> ...a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or ***provides sufficient detail to the servicer regarding other information sought by the borrower.*** [emphasis added]

Plaintiffs' QWR provides "sufficient detail...regarding other information sought by the borrower." Therefore, Plaintiffs' QWR is a valid QWR under RESPA.

Section 2605(e)(2)(C) provides that a servicer

> after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

SPS did neither of the above. The first time SPS even acknowledged the QWR (by claiming that it is not a valid QWR) was in their Motion to Dismiss, some six months later.

Additionally, SPS continues to place negative coding on Plaintiffs' credit reports. Pursuant to 12 U.S.C. § 2605(e), placing any negative coding on Plaintiffs' credit reports before responding to the QWR letter is a violation of RESPA and the FCRA for which SPS can be held civilly liable. Section 2605(e)(3) and Section 2605(f)(1) provide:

> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of title 15).
>
> Whoever fails to comply with any provision of this section shall be liable to the borrower for *each such failure* in the following amounts:
>
> (1) Individuals
>
> In the case of any action by an individual, an amount equal to the sum of—
>
> (A) any actual damages to the borrower as a result of the failure; and
>
> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.
>
> [Emphasis added]

SPS has continued to report negative information to the credit bureaus since the first QWR letter was sent on January 28, 2009, some six months ago.

Additionally, due to SPS' failure to respond to Plaintiffs' QWR, Plaintiffs have been impeded in their drafting of their complaint.

### 4.    Fraudulent misrepresentation as to Homefield

Sometime in late July 2004, we responded to a letter sent by Homefield stating that Homefield promising a lower interest rate and lower monthly mortgage payments. We spoke with Homefield's representative, Michael Silva and told him we were interested in a 30 year fixed rate loan. Additionally, we did not want to deal with a mortgage broker since we were aware that a mortgage broker's fees are quite high. Mr. Silva advised us that Homefield funds their own loans and there are no mortgage brokers.

On August 13, 2004, Hurricane Charlie hit the Central Florida area damaging Plaintiffs' home. As a result, Mr. Silva advised that the refinance could not be completed until after the repairs to home were completed. Mr. Silva kept in touch as to the status of the repairs.

In April 2005, we advised Mr. Silva that the repairs were completed. We advised Mr. Silva that we were interested in a 30 year fixed rate loan. Mr. Silva, however, provided us with a Good Faith Estimate for an adjustable rate mortgage ("ARM"). We advised Mr. Silva that we were not interested in an ARM as we did not want any surprises in the future. We had no plans on refinancing again any time in the future. Mr. Silva advised us that this was the best loan for us. He explained that, although we had good credit, our credit was not excellent. He further explained that this was what he referred to as a "bandage" loan. The loan would allow us to raise our credit ratings even further in two years, after which, Homefield would modify the loan to a fixed rate loan. Additionally, in order to receive a "special lower interest rate,"Mr. Silva asked that we promise to call Homefield in two years. At no time did Mr. Silva ever explain the full cost of the loan. One of things that we adamant about was that we did not want to deal with a mortgage broker. Mr. Silva repeatedly told us that his company funds its own loans.

### 5.    Fraudulent misrepresentations and FTC claims against SPS

We called SPS in April 2007, who in turn referred us to Homefield, to ask what we needed to do in order for our loan to be modified to a 30 year fixed as promised. We were told by an SPS representative that our loan does not permit modifications.

Following receipt of the rate change letter in May 2007, I called SPS to request a modification. I explained that my husband had been laid off in February 2007 and that the new payment would be difficult to make. Once again, we were told by a representative of SPS that the loan documents do not permit a modification.

In July 2007, I called SPS to again tell them that we would not be able to make the loan payment and the escrow payments. I was told that if we paid two months' mortgage payments, SPS would consider working with us.

In August 2007, my husband suffered a heart attack. I called SPS to advise them of this fact and to request forbearance. I advised SPS that my husband was still out of work. SPS told me that we did not qualify for forbearance.

In September 2007, I again called SPS to request forbearance. I was told that since my husband was still unemployed, we did not qualify. The SPS representative told me to call back when my husband began working again.

In October 2007, my husband began working and I called SPS to request forbearance. This time, I was told that we did not qualify because my husband had not been employed long enough.

I did not call SPS in November 2007 but called again in December 2007. I was told that we were approved for forbearance. The representative from SPS told me that if we made the next three payments on time, SPS would modify the loan. He further told me that the agreement

would contain a balloon payment and that I should not be alarmed as that amount would be wrapped into the modified loan. I received the agreement on the evening of December 16, 2007. The cover letter stated that the agreement along with the first payment was due December 18, 2007. We signed the agreement that evening and I overnighted the agreement with the first payment to SPS. I also faxed a copy of the agreement on December 17, 2007. We made the three payments on time.

On or about December 18, 2007, we received a letter dated December 17, 2007 titled Notice of Default. There was a significant discrepancy in the amounts alleged owed by SPS between the agreement and the letter. I called SPS to ask why we had been sent the letter when we had already signed an agreement. I was told to disregard the letter and that the amounts on the letter were incorrect.

In March 2008, I called SPS to ask what I needed to do in order to have the loan modified. SPS' representative asked me to make the balloon payment. Additionally, she stated that I needed to apply for a modification. I explained to her that I had applied in December and had been approved.

A few days later, I responded to a call from SPS. The representative called to ask when they would be receiving the balloon payment. I told the representative that I had applied for a modification in December and was approved. Further I told her that I was told in December that if I made the next three payments on time, SPS would modify my loan. The representative then advised me that SPS does not do modifications.

SPS pattern and practice is in direct violation of its Modified Stipulated Final Judgment and Order with the FTC executed on September 4, 2007. A copy is attached as Exhibit C.

**D.**   **Plaintiff's Complaint States a Cause of Action Against the Defendant Mortgage Electronic Registration System, Inc.**

SPS, Homefield, U.S. Bank, and MERS conspired to fabricate a sham assignment from Homefield to U.S. Bank.  Paragraph 34 of Plaintiffs' complaint states, "Defendants assigned or attempted to assign the Note and mortgage to parties who did not take these instruments in good faith or without notice that the instruments were invalid or that Plaintiffs had a claim in recoupment."

Defendant MERS states in its Motion to Dismiss that Plaintiffs have made only one factual allegation as to any conduct by MERS, namely MERS was named as the "mortgagee" on Plaintiffs' mortgage, "acting solely as a nominee for Lender and Lender's successors and assigns."  That mortgage contained a false representation on its face when it represented that Defendant MERS was a mortgagee under the mortgage.

Furthermore, MERS states in its Motion to Dismiss

> Two aspects of the loan are then usually bought and sold—the servicing rights and the beneficial rights. *Id.* The servicing rights include the right to collect monthly escrow, principal, and interest payments from the borrower, and the beneficial rights include the right to receive the repayment of the loan itself. *Id.*

A mortgagee is "the lender who gives the loan secured by the mortgage." *Landmark National Bank v. Kesler*, -- P.3d --, 2008 WL 4180346 (Kan. App. Sept. 12, 2008), citing BLACK'S LAW DICTIONARY 674, 1034 (8th ed. 2004).  The court concluded that a mortgagee is one who has an interest in the debt; in the usual case, this person or entity is the lender. *See id.*

In its analysis of MERS' position as "nominee" for the true lender, the court noted that MERS had no right to the underlying debt, MERS did not receive payments and remit them to

the lender, MERS was not listed as the party to contact upon default or foreclosure, and the mortgage strictly limited MERS' right to enforce the mortgage. The statement that MERS is the "Nominee" is nonsensical language which means nothing in a real estate transaction.

MERS is NOT the mortgagee under the mortgage as it was not the source of funding for the "loan." MERS has never been nor is it now the mortgagee under the mortgage. The language is a sham. MERS own records demonstrate the falsity of the information on the document. Documents taken from MERS' own website demonstrate that it is NOT a beneficiary under any mortgage. MERS neither has the rights of a servicer "to collect monthly escrow, principal, and interest payments from the borrower" nor does it have the rights of the beneficiary "to receive the repayment of the loan itself."

Documentation attached as Exhibit D from Defendant MERS' website demonstrates that it is nothing more that a computer system designed by the mortgage industry to protect them from having to pay recording fees so that the entity that owns any mortgage loan is available. MERS' entire business operation is premised on the wholesale and everchanging sale or transfer or "servicing rights."

The documentation demonstrates that Defendant MERS does not own loans; rather they are acting as a "nominee" for whoever might or might not say that it owns the loan at any given time.

The creation of the MERS system was for the unlawful purpose of hiding and insulating the brokers and originators of predatory toxic loans from accountability and liability by informing all lenders who originated loans that named MERS as the beneficiary of the following:

        a.     MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust, and that

the lender, MERS was not listed as the party to contact upon default or foreclosure, and the mortgage strictly limited MERS' right to enforce the mortgage. The statement that MERS is the "Nominee" is nonsensical language which means nothing in a real estate transaction.

MERS is NOT the mortgagee under the mortgage as it was not the source of funding for the "loan." MERS has never been nor is it now the mortgagee under the mortgage. The language is a sham. MERS own records demonstrate the falsity of the information on the document. Documents taken from MERS' own website demonstrate that it is NOT a beneficiary under any mortgage. MERS neither has the rights of a servicer "to collect monthly escrow, principal, and interest payments from the borrower" nor does it have the rights of the beneficiary "to receive the repayment of the loan itself."

Documentation attached from Defendant MERS' website demonstrates that it is nothing more that a computer system designed by the mortgage industry to protect them from having to pay recording fees so that the entity that owns any mortgage loan is available. MERS' entire business operation is premised on the wholesale and everchanging sale or transfer or "servicing rights."

The documentation demonstrates that Defendant MERS does not own loans; rather they are acting as a "nominee" for whoever might or might not say that it owns the loan at any given time.

The creation of the MERS system was for the unlawful purpose of hiding and insulating the brokers and originators of predatory toxic loans from accountability and liability by informing all lenders who originated loans that named MERS as the beneficiary of the following:

        a.     MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust, and that

    b.    MERS could be named as beneficiary for purposes of public notice and notice to the borrower and would act in that capacity if so designated by the lender who originated the loan.

Defendants Homefield, SPS, and U.S. Bank are members of MERS. MERS informs its members that using the MERS system would remove transaction records from the public record. Removing real estate transaction records from the public record maintained by the county clerks prevents oversight of real estate transactions by the public and by public officials.

MERS has publicly stated the following:

    a.    MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

    b.    "With the recording of the security instrument(s), MERS becomes the mortgagee in the county land records and no assignments are required during a subsequent sale and transfer of the loan between MERS members."

    c.    "There is no dependency on the corporate name you use on closing documents and the corresponding corporate name on the MERS System because the MERS System is not the legal system of record of ownership of mortgage loans."

Additionally, MERS. has publicly stated:

    a.    "The MERS web site enables you to target directly your MERS® Ready products and services to MERS members."

    b.    "Commercial originators and issuers save *hundreds to thousands of dollars* (in the case of cross-collateralized loans) in preparing and

recording assignments. Where the originator has not recorded a MERS as Original Mortgagee (MOM) security instrument, *the issuer saves the costs of assigning to the Trust* by having the originator assign to MERS." (Emphasis added).

c.    "It will reduce risk and generate more profits for lenders because the *Notes registered on it will be in electronic format.* It shortens the timeframe between the closing and the securitization of the loan, enabling the Note to move instantly, creating faster funding." (Emphasis added).

The MERS rules and by-laws, to which MERS Members agree, cannot be carried out lawfully because they require the following:

> 1. *MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.*, and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents. 2. *The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan* that the Member registers on the MERS® System. *MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee*, in an administrative capacity, for the beneficial owner or owners thereof from time to time. *MERS shall have no rights whatsoever* to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. *MERS agrees not to assert any rights* (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. *** 6. MERS and the Member agree that: (i) *the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans*, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the

mortgage loans, and (iii) membership in MERS or use of the MERS®
System shall not modify or supersede any agreement between or among
the Members having interests in mortgage loans registered on the MERS®
System."

[Emphasis added].

The information from MERS also demonstrates the falsity of the purported assignment of
the mortgage from Homefield to U.S. Bank. The same person signed assignments, ostensibly as
an officer of two different corporations. On June 6, 2008, Bill Koch, an employee of SPS posing
as an Assistant Secretary with MERS, executed an Assignment of the Plaintiffs' mortgage loan
from MERS (which was never the mortgagee under the mortgage) to U.S. Bank. The notary
asserts that Mr. Koch is "personally known" to her to an Assistant Secretary of MERS. A copy
of the assignment is attached hereto and incorporated as Exhibit D. Two days prior, on June 4,
2008, the same notary notarized the signature of Mr. Koch, this time as the Document Control
Officer of SPS. A copy of this assignment is attached as Exhibit E. On this same day, June 4,
2008, the same notary notarized the signature of Mr. Koch as the Assistant Secretary of MERS.
A copy of this assignment is attached as Exhibit F. Within the span of two days, Mr. Koch went
from being the Assistant Secretary of MERS to the Document Control Officer of SPS and back
to being the Assistant Secretary of MERS.

MERS' records explain a portion of the source of the misrepresentations – it purports to
appoint unidentified and unspecified persons as "officers" of MERS for the purpose of executing
documents to effect transfers. Plaintiffs maintain that this is a sham act and that a corporation
cannot create corporate officers in blank, without specificity and without identification. Under
this premise, MERS is contending that anyone who works for some mortgage lender, servicing
company, foreclosing trustee, title company, etc. can become an officer of MERS without
providing it with notification, without getting its approval or even identifying the person to

assign mortgages to new owners (even if that new MERS officer is also an officer of the alleged new owner of the loan) or take whatever actions the other companied desired. Plaintiffs maintain this is nothing more than a sham transaction and therefore the assignment from MERS to U.S. Bank is invalid.

MERS states in its Motion to Dismiss that "At the origination of the loan, the lender takes possession of the note (and becomes the holder of the note)." By its own admission, under the MERS system, the note and mortgage are bifurcated. MERS retains possession of the mortgage while the lender takes possession of the note. When the note is split from the mortgage, then the note becomes unsecured and a person holding only the note lacks the power to foreclose and a person holding only a mortgage suffers no default because only the holder of the note is entitled to payment on it.

The apparent rule in Florida is that an assignment of a mortgage without an assignment of the related mortgage note is deemed a nullity and creates no right in the assignee because a mortgage is a mere lien incidental to the obligation it secures. 37 Fla. Jur. 2nd, Mortgages, Section 511. See e.g., *Sobel v. Mutual Development, Inc.*, 313 So.2d 77 (Fla. 1st DCA 1975). *Vance v. Fields*, 172 So.2d 613 (Fla. 1st DCA 1965). "...for there to be a valid assignment, there must be more than just assignment of the mortgage alone, the note must also be assigned. *Saxon Mortgage Services, Inc., et al v. Ruthie B. Hillery, et al,.* 2008 U.S. Dist. LEXIS 100056. (quoting *Carpenter v. Longan*, 83 U.S. 271, 274, 21 L. Ed. 313 (1872)(stating that "[t]he note and mortgage are inseparable; the former as essential, the latter as an incident"; adding that "[a]n assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity"). "Since MERS, Inc. had no ownership interest in said note, it could not assign it to the plaintiff and any assignment purportedly transferring the ownership interest from .... to the

plaintiff by a MERS, Inc. assignment of said note is a nullity." *Deutche Bank National Trust Company v Cluudevll,* 16 Misc.3d 1140, 2007 WL 2709996 *[NY* Sup, Kings Cty, Schack, J. 9/8/07]; *LaSalle Bank v Lamy,* 12 Misc.3d 1191; 8/17/06 NYLJ 25[col.I], [**NYSup,** Suffolk **Cty,** Burke, J. 8/7/06]).   There is no evidence that Homefield ever assigned the note to MERS, nor is there evidence that MERS ever held the note, nor is there evidence that Homefield gave MERS authority to assign the note to Plaintiff.   The evidence presented does not show a clear chain of title of the note from Homefield to U.S. Bank.

However, on its website MERS states that the notes registered on it are in electronic format which enables the note to move instantly creating faster funding.   Additionally, upon information and belief, the Pooling and Servicing Agreement ("PSA") which governs this loan, states that the Note is to be delivered to the Custodian. (Note: The PSA, along with all the trust origination documents, is one of the documents requested by Plaintiffs in their QWR which has not been provided)

The question is "which is it?"   Does the lender take possession of the note at the origination of the loan thereby splitting the note from the mortgage?  If so, the lender in this case is Homefield which went out of business in 2007.   The Note is in the name of Homefield.   So how can Homefield direct MERS to assign the Note when it is no longer in business?   Who directed MERS to assign and/or negotiate the note?   Where is the authorization from Homefield allowing MERS to assign and/or negotiate the note?   Is MERS negotiating converted electronic notes without the express permission of the issuer (*i.e,* the obligor) in violation of the Uniform Electronic Transactions Act ("UETA")?

Under UETA, E-Notes are permissible and they are considered negotiable instruments per UCC 3.   However, these are electronic documents from their inception and the parties agree

to the use of the e-signatures. Section 16 limits the definition of a transferable record in two significant ways. First, only the equivalent of paper promissory notes and paper documents of title can be created as transferable records. The operative word is "created."

This brings us to the second limitation which is that the issuer of an electronic record must expressly agree that the electronic record is to be considered a transferable record. Therefore, conversion of a paper note issued cannot become a transferable record because the issuer would not be the issuer in the case of the electronic record. The purpose of this restriction is assure that a transferable record can only be created at the time of issuance by the obligor. A paper note that has been converted is not a negotiable instrument without the express consent of the issuer. Florida Statue §668.50 (16) states:

TRANSFERABLE RECORDS.--

(a)     For purposes of this paragraph, "transferable record" means an electronic record that:

1.     Would be a note under chapter 673, or a document under chapter 677, if the electronic record were in writing.

2.     The *issuer of the electronic record expressly has agreed* is a transferable record. [Emphasis added]

Plaintiffs did not expressly consent to the conversion of the Promissory Note. Plaintiffs allege that the use of their electronic signature via the conversion of paper documents is a fraudulent use of their signatures. Plaintiffs stated in their Complaint that "...Homefield and the Nominee on the Mortgage(MERS), had no financial stake(i.e., liability) in the transaction and no interest other than obtaining Plaintiffs' signatures on a "loan" that could never be repaid,

contrary to representation and assurances from the conspiring participants in this fraudulent scheme."

## CONCLUSION

Based on the facts that Plaintiffs were not provided accurate material disclosures, Plaintiffs had an extended right of rescission which Plaintiffs' exercised within the statute of limitation. However, Defendants SPS, Homefield, and U.S. Bank failed to take the required steps under TILA. This was a violation of Section 1635 which gave Plaintiffs the right to bring a claim within one year of this violation against these Defendants under Section 1640. Therefore, Plaintiffs are entitled to a rescission of the loan as well as the award of statutory and punitive damages.

Additionally, in violation of TILA and RESPA, SPS continues to this day to report negative information on Plaintiffs' credit reports.

Even though SPS, Homefield, and U.S. Bank were on notice that Plaintiffs' had timely exercised their right of rescission, all three, with the cooperation of MERS, assigned the voided mortgage from Homefield to U.S. Bank. Additionally, MERS attempted to assign the note for which it was not the holder nor the owner. MERS never had possession of the Note. Additionally, MERS, SPS, Homefield, and U.S. Bank were all complicit in the fraudulent use of Plaintiffs' signatures in order to make a profit.

WHEREFORE, Plaintiffs move this Honorable Court to deny the Motions to Dismiss filed by Defendants Mortgage Electronic Registration Systems, Select Portfolio Servicing, Inc., and U.S. Bank.

July  7  , 2009
August

Respectfully submitted,

_____
Azizally S. Virani

_____
Alina A. Virani
2339 Princess Deanna Lane
Katy, TX 77493
832.366.3526
Virani0786@yahoo.com

*Pro Se Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August _____7_____, 2009, I mailed a true and correct copy of the

foregoing document by U.S. Mail to:

**ROBERT M. BROCHIN**
*Morgan, Leewis & Brockins, LLP*
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2339
rbrochin@morganlewis.com

*Counsel for Mortgage Electronic Registration Systems*

JEFFREY S. LAPIN
N. ALEJANDRA ARROYAVE
LAPIN & LEICHTLING
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone: (305) 569-4100
Facsimile: (305) 569-0000
E-mail: JLapin@ll-lawfirm.com
AArroyave@ll-lawfirm.com

*Attorneys for Select Portfolio Servicing, Inc. and
U.S. Bank National Association, as Trustee*


_____
Alina A. Virani, *Pro Se Plaintiff*